## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| PETER H. RONNFELDT, | ) | |
| | ) | |
| Plaintiff, | ) | 8:11CV305 |
| | ) | |
| vs. | ) | ORDER |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner of | ) | |
| Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

The plaintiff, Peter H. Ronnfeldt (Ronnfeldt), filed an application for disability benefits under Title II of the Social Security Act (Act), 42 U.S.C. §§ 401, *et seq.*, on August 29, 2007, alleging disability beginning August 10, 2006, due to asthma, sleep apnea, and depression. The Social Security Administration (SSA) denied benefits initially on October 16, 2007, and upon reconsideration on March 20, 2008. An administrative law judge (ALJ) held a hearing on April 16, 2010. On May 14, 2010, the ALJ determined Ronnfeldt was not disabled as defined by the Act from August 10, 2006, through the date of the decision. The Appeals Council denied Ronnfeldt's request for review on July 5, 2011. Ronnfeldt now seeks judicial review of the ALJ's determination as it represents the final decision of the SSA Commissioner.[1]

Ronnfeldt filed a brief (Filing No. 18) in support of this administrative appeal. The Commissioner filed the administrative record (AR.) (Filing Nos. 9, 10, 11) and a brief (Filing No. 24) in opposition to Ronnfeldt's appeal for benefits. Ronnfeldt filed a brief (Filing No. 25) in reply. Ronnfeldt appeals the Commissioner's decision, asking the decision be reversed and benefits awarded because the ALJ: (1) failed to give controlling weight to the opinions of the treating psychiatrist, William C. Fuller, M.D. (Dr. Fuller); (2) erred in finding Ronnfeldt could perform "medium work" even though the ALJ limited the claimant to "light work"; (3) erred in finding Ronnfeldt could perform work as a production assembler without consideration of Ronnfeldt's credible postural limitations; (4) failed to fairly and fully develop the medical evidence by failing to obtain work-related mental limitations from a treating or

---

[1] The parties consented to jurisdiction by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). **See** Filing No. 15.

examining medical source; and (5) failed to fully and fairly develop the record regarding Ronnfeldt's literacy.  **See** Filing No. 18 - Plaintiff's Brief p. 12-27.  After reviewing the record, the ALJ's decision, the parties' briefs, and applicable law, the court finds the ALJ's ruling, that Ronnfeldt was not disabled, should be affirmed because it is supported by substantial evidence in the record.

## ADMINISTRATIVE RECORD

Ronnfeldt was born March 14, 1956 (AR. 100).  At the time of the administrative hearing, Ronnfeldt was fifty-four years old and had lived in Siouxland for fifty years (AR. 45). After the completing a ninth grade education, Ronnfeldt began work as a mechanic at the Missouri Valley Machinery (AR. 42, 428).  From 1973 to 1983, Ronnfeldt worked for D & N Construction (AR. 301).  From 1983 to 1993, Ronnfeldt worked as a concrete finisher for Larry Mahr Construction (AR. 301).  In 1993, Ronnfeldt began work as a machine operator at the plastic plant Elastomer Engineering Company (EEC) (AR. 301, 408).  Ronnfeldt worked at EEC until July 2006, when he lost his job due to health issues caused by breathing smoke and fumes at work (AR. 43-44, 56).  On August 29, 2007, Ronnfeldt applied for disability benefits based on asthma, a learning disability, and mental health problems (AR. 105, 110).

### A.    Medical Records

Before Ronnfeldt regularly saw physicians for chest and lung related issues, Ronnfeldt visited doctors for various, unrelated maladies.  On February 10, 1986, St. Luke's Regional Medical Center (St. Luke's) admitted Ronnfeldt for chest pain (AR. 611). Ronnfeldt was again admitted to St. Luke's on December 5, 1995, for acute febrile illness, pneumonia, reactive bronchospasm, mild reactive hyperglycemia, reactive leukocytosis, and dehydration, and remained at St. Luke's until December 8, 1995 (AR. 611).  On September 22, 2000, St. Luke's admitted Ronnfeldt for right foot surgery (AR. 611).  On December 17, 2001, the Siouxland Surgery Center admitted Ronnfeldt for right elbow surgery (AR. 625-638).  On August 2, 2004, and August 3, 2004, Ronnfeldt saw Kevin J. Folchert, M.D. (Dr. Folchert), because of eye problems (AR. 612-613).  Dr. Folchert noted Ronnfeldt was alert,

2

oriented, comfortable, and in no acute distress (AR. 612-613). Dr. Folchert diagnosed Ronnfeldt with acute conjunctivitis (AR. 612-613).

Ronnfeldt's regular physician visits for chest and lung related issues began in late 2004. On September 27, 2004, Ronnfeldt saw Dr. Folchert for respiratory difficulties (AR. 613). Ronnfeldt reported a cough, congestion, wheezing, tightness, and shortness of breath (AR. 613). Dr. Folchert noted Ronnfeldt was alert, oriented, and in no acute distress (AR. 613). Dr. Folchert diagnosed asthmatic bronchitis, prescribed Prednisone, and excused Ronnfeldt from work for two days (AR. 613).

On January 18, 2005, and January 24, 2005, Dr. Folchert examined Ronnfeldt for chest congestion and shortness of breath (AR. 614). Dr. Folchert diagnosed asthmatic bronchitis and prescribed antibiotics (AR. 614). During theJanuary 24, 2005, appointment, Dr. Folchert admitted Ronnfeldt to St. Luke's (AR. 614). Ronnfeldt stayed at St. Luke's until January 28, 2005, for asthmatic bronchitis with respiratory distress (AR. 611).

Ronnfeldt saw Dr. Folchert on February 1, 2005, for a post-hospital follow-up (AR. 615). Ronnfeldt reported improved breathing with no wheezing or shortness of breath (AR. 615). Dr. Folchert noted the asthmatic bronchitis was resolved and released Ronnfeldt for work on February 2, 2005 (AR. 615). On October 11, 2005, Ronnfeldt again saw Dr. Folchert because of chest congestion and a cough (AR. 615). Dr. Folchert diagnosed acute bronchitis and prescribed antibiotics (AR. 615).

On November 8, 2005, Ronnfeldt saw Dr. Folchert for low-back pain (AR. 616). Dr. Folchert noted Ronnfeldt was alert, oriented, comfortable, and in no acute distress (AR. 616). Dr. Folchert provided Ronnfeldt with medication to alleviate the pain and back spasms (AR. 616). On December 9, 2005, Ronnfeldt saw Dr. Folchert due to a sore throat (AR. 616). Dr. Folchert diagnosed acute pharyngitis and prescribed antibiotics (AR. 616).

On March 22, 2006, Dr. Folchert examined Ronnfeldt for low-back pain (AR. 618). The X-ray revealed mild degenerative spurring and some calcification on the aorta (AR. 618, 624). Dr. Folchert prescribed medication for the pain and back spasms (AR. 618).

On April 7, 2006, Ronnfeldt saw Dr. Folchert for preoperative procedures for Ronnfeldt's eyes (AR. 617, 659). Ronnfeldt scheduled cataract surgery for April 18, 2006, and  May 2, 2006 (AR. 617, 659). Ronnfeldt was admitted to St. Luke's on April 18, 2006,

3

and May 2, 2006, for right and left eye surgery (AR. 611, 660-697). Beth K. Bruening, M.D., performed Ronnfeldt's surgery and noted there were no complications (AR. 666, 684).

On July 18, 2006, Ronnfeldt saw Dr. Folchert because of complaints of shortness of breath, coughing, chest congestion, and wheezing (AR. 618). Dr. Folchert noted Ronnfeldt was alert, oriented, comfortable, and in no acute distress (AR. 618). Dr. Folchert diagnosed asthmatic bronchitis and prescribed antibiotics (AR. 618). Dr. Folchert examined Ronnfeldt again on July 26, 2006, due to persisting asthmatic bronchitis (AR. 619). Dr. Folchert changed Ronnfeldt's antibiotics and referred Ronnfeldt to pulmonology (AR. 619).

On August 4, 2006, Ronnfeldt saw Jitendrakumar S. Gupta, M.D. (Dr. Gupta), for an evaluation of Ronnfeldt's lungs (AR. 380). Ronnfeldt exhibited a cough, expectoration, shortness of breath, and wheezing (AR. 380). Dr. Gupta performed a pulmonary function test that showed severe airflow obstruction, which significantly improved with bronchodilators (AR. 380). Dr. Gupta diagnosed asthma with chronic bronchitis, dyspnea, and cough and expectoration (AR. 381). Dr. Gupta noted Ronnfeldt's symptoms were secondary to occupational exposure of PVC fumes and prescribed Advair and Singulair (AR. 381). Ronnfeldt had a follow-up appointment with Dr. Gupta on August 9, 2006 (AR. 379). Dr. Gupta noted improvement in Ronnfeldt's condition compared to Ronnfeldt's August 4 appointment and advised Ronnfeldt to avoid fumes and dusty environments (AR. 379). Dr. Gupta continued Ronnfeldt on Advair and Singulair (AR. 379).

Also on August 9, 2006, Ronnfeldt saw Dr. Folchert for a checkup of Ronnfeldt's lungs (AR. 361, 619). Dr. Folchert noted Ronnfeldt was pleasant, alert, oriented, comfortable, in no acute distress, and was breathing better without any wheezing (AR. 361, 619). Dr. Folchert diagnosed asthmatic bronchitis with underlying chronic obstructive pulmonary disease (AR. 361).

On August 29, 2006, Ronnfeldt had an appointment with Susanna Von Essen, M.D. (Dr. Von Essen), at the Pulmonary Clinic at the Nebraska Medical Center (AR. 398). Ronnfeldt reported he felt better after he quit work but was often tired (AR. 398). Dr. Von Essen noted Ronnfeldt had isocyanate induced asthma and should avoid further isocyanate exposure (AR. 400).

4

On September 12, 2006, Ronnfeldt saw Dr. Gupta for an appointment for Ronnfeldt's asthma (AR. 378).  Dr. Gupta noted Ronnfeldt was "okay" (AR. 378).  Dr. Gupta scheduled a sleep study for Ronnfeldt and recommended Ronnfeldt engage in at least fifteen minutes of some kind of aerobic exercise (AR. 378).

On September 20, 2006, St. Luke's admitted Ronnfeldt to conduct a polysomnogram (AR. 365-366).  Robert M. Stewart, M.D. (Dr. Stewart), administered the polysomnogram and diagnosed Ronnfeldt with obstructive sleep apnea (AR. 365).  Dr. Stewart noted there was marked improvement with use of a nasal Continuous Positive Airway Pressure (CPAP) machine (AR. 365).

On October 10, 2006, Ronnfeldt had an appointment with Dr. Von Essen (AR. 396).  Ronnfeldt informed Dr. Von Essen he had not worked since August 29, 2006, although he had been able to go fishing (AR. 396).  Dr. Von Essen noted Ronnfeldt had not had an episode of airway disease since Ronnfeldt quit work (AR. 396).  Dr. Von Essen opined Ronnfeldt reached maximum medical improvement (AR. 396).

On October 12, 2006, Ronnfeldt saw Dr. Gupta for Ronnfeldt's asthma (AR. 377).  Dr. Gupta reviewed the sleep study and noted Ronnfeldt's asthma improved and started Ronnfeldt on CPAP (AR. 377).  On November 9, 2006, Ronnfeldt had an appointment with Dr. Gupta (AR. 376).  Dr. Gupta noted Ronnfeldt's sleep improved with the CPAP and Ronnfeldt's asthma "is as good as it is going to get" and he "does have quite a bit of limitation on exercise" (AR. 376).  Dr. Gupta noted Ronnfeldt's total lung capacity was 85% and he had morbid airflow obstruction (AR. 376).  Dr. Gupta informed Ronnfeldt he needed to avoid any plastic fume exposure, ammonia, and humid, cold environments (AR. 376).  Dr. Gupta noted Ronnfeldt could continue work with those restrictions (AR. 376).  Dr. Gupta diagnosed Ronnfeldt with chronic, persistent asthma with fixed airflow obstruction and sleep apnea (Ar. 376).  Dr. Gupta continued Ronnfeldt on Advair and Singulair (AR. 376).

On January 9, 2007, Ronnfeldt had an appointment with Dr. Gupta (AR. 375).  Dr. Gupta noted Ronnfeldt was "okay" but still had the same work restrictions as his November 9, 2006, appointment (AR. 375).  Dr. Gupta opined "[he] hoped [Ronnfeldt] can find a job with [Ronnfeldt's] limitation (AR. 375).  Dr. Gupta continued Ronnfeldt on Advair and Singulair (AR. 375).  Ronnfeldt had another appointment with Dr. Gupta on April 13, 2007

5

(AR. 375). Dr. Gupta noted Ronnfeldt was, overall, very well, had no significant trouble over the entire winter, and "doing as well as can be expected" (AR. 375, 465).

On July 18, 2007, Ronnfeldt was referred to Laurence J. Fuortes, M.D. (Dr. Fuortes), for an impairment evaluation for isocyanate-induced occupational asthma (AR. 408). Ronnfeldt related he experienced chest tightness and shortness of breath at Ronnfeldt's work; however, he had improved within the year he was away from work (AR. 408). Ronnfeldt stated he had bronchitis three to four times (AR. 408). Dr. Fuortes noted the CPAP machine dramatically improved Ronnfeldt's ability to sleep (AR. 408). Dr. Fuortes concluded Ronnfeldt had a forty-one percent impairment of his body due to Ronnfeldt's occupational asthma (AR. 410).

On September 19, 2007, Ronnfeldt completed a Daily Activities and Symptoms Report (AR. 287-291). Ronnfeldt reported he would "look at [the] paper," "work out in garden," "watch TV," and do "all the chores" (AR. 287). Ronnfeldt was able to mow, weed, and maintain a garden (AR. 287). Ronnfeldt also maintained his pickup truck and changed the oil (AR. 287). As for hobbies, Ronnfeldt listed gardening, walking around the block for twenty minutes, and reading magazines (AR. 288). Ronnfeldt listed his social activities as going to his parents home almost every day and visiting his friends a couple times a week (AR. 288). Ronnfeldt reported he could stand for two hours at one time and sit for one to two hours at one time before becoming uncomfortable (AR. 288).

On October 16, 2007, A.R. Hohensee, M.D. (Dr. Hohensee), completed a Physical Residual Functional Capacity Assessment for Ronnfeldt (AR. 418-426). In the assessment, Dr. Hohensee noted Ronnfeldt's primary diagnosis was "asthma chronic" with a secondary diagnosis of "sleep apnea - stable" (AR. 418). Dr. Hohensee determined Ronnfeldt could lift up to ten pounds frequently and up to twenty pounds occasionally, could stand and walk for about six hours in an eight-hour workday, could sit for about six hours in an eight-hour workday, and could push and pull with no limitations (AR. 419). Dr. Hohensee also determined Ronnfeldt could occasionally climb and frequently balance, stoop, kneel, crouch, and crawl (AR. 420). Dr. Hohensee determined Ronnfeldt should avoid even moderate exposure to fumes, odors, dusts, gases, poor ventilation, etc., and should avoid concentrated exposure to extreme cold or heat, humidity, and vibration (AR. 422). Dr.

6

Hohensee determined Ronnfeldt does not have manipulative, visual, or communicative limitations (AR. 421-422).  Dr. Hohensee concluded Ronnfeldt was "partially CRED" as Ronnfeldt had fixed airflow obstruction linked with chronic asthma but Ronnfeldt's comment that his condition was disabling "is not confirmed by the [medical evidence of record]" (AR. 423).  Dr. Hohensee also concluded Ronnfeldt's lungs were clear and his functional loss does not meet or equal the listing of a disability (AR. 423).  On October 29, 2007, Dr. Gupta agreed with Dr. Hohensee that Ronnfeldt could perform light work (AR. 867).  On March 18, 2008, Jerry Reed, M.D. (Dr. Reed), reviewed Ronnfeldt's records and affirmed Dr. Hohensee's October 16, 2007, assessment without additional comments (AR. 460).

On October 25, 2007, Dr. Von Essen responded to Dr. Hohensee's October 16, 2007, assessment (AR. 894).  Dr. Von Essen stated Dr. Hohensee overestimated Ronnfeldt's capabilities by indicating Ronnfeldt could walk for six hours in an eight-hour work day (AR. 894).  Dr. Von Essen opined Ronnfeldt could stand in one spot for six hours and climb stairs, stoop, crouch, kneel, and crawl each for only one-quarter of an hour in an eight-hour workday (AR. 894).

On January 31, 2008, Dena Z. Olwan, Ph.D. (Dr. Olwan) evaluated Ronnfeldt (AR. 428).  Dr. Olwan performed a Wechsler Adult Intelligence Scale - III (WAIS-III) and psychological interview (AR. 428).  Ronnfeldt reported to Dr. Olwan he lived alone for about thirty years and each day he wakes up, drinks a coffee, reads a newspaper, and visits his father (AR. 431).  Ronnfeldt does basic house cleaning once a week, washes dishes twice a week, does laundry twice a week, cooks for himself, and tends his yard (AR. 431).  Ronnfeldt achieved a verbal IQ of 75, a performance IQ of 76, and a resulting full scale IQ of 75, each of which falls into the borderline intellectual functioning (BIF) range (AR. 429-430).  Dr. Olwan concluded Ronnfeldt "does not appear to be experiencing a formal depressive disorder based on his current symptoms and denied symptoms that would suggest significant social avoidance or withdrawal" (AR. 431).  Further, Dr. Olwan concluded there was no evidence of agoraphobia (AR. 431).  Dr. Olwan noted Ronnfeldt denied experiencing distressing social anxiety or fears of leaving the home (AR. 431).  Although Ronnfeldt may avoid places where there may be a crowd, Ronnfeldt denied this significantly inhibited his daily activities or social functioning (AR. 431).  Dr. Olwan

7

concluded Ronnfeldt was capable of understanding and carrying out simple instructions and tasks without supervision (AR. 431). Dr. Olwan diagnosed Ronnfeldt with an adjustment disorder with mixed anxiety and depressive symptoms and assigned Ronnfeldt a GAF score of 65-70[2] (AR. 431-432).

On February 26, 2008, Patricia Newman, Ph.D. (Dr. Newman) completed a Mental Residual Functional Capacity Assessment (MRFCA) and a Psychiatric Review Technique (PRT) (AR. 440-459). Dr. Newman noted Ronnfeldt was "Not Significantly Limited" in eighteen of the twenty categories (AR. 440-441). In the remaining two categories, ability to understand and remember detailed instructions and ability to carry out detailed instructions, Dr. Newman concluded Ronnfeldt was "Markedly Limited" (AR. 440). Dr. Newman noted Ronnfeldt was reserved but appeared to have adequate social skills and judgment, demonstrated good concentration, and had no overt signs of dysphoria, anxiety, or irritability (AR. 442). Ronnfeldt reported he had brief, recurrent periods of sadness or dreariness attributed to not working (AR. 442). Ronnfeldt also reported he lived alone, prepared his own meals, did his own laundry, cleaned, maintained his yard and garden, and did his own shopping (AR. 442). Ronnfeldt denied having any significant problems leaving his home, being around people, or maintaining social relationships with friends and family (AR. 442). Dr. Newman stated there were no symptoms to support agoraphobia and depression (AR. 442). In the PRT, Dr. Newman noted Ronnfeldt's impairments were not severe although Ronnfeldt had an "Organic Mental Disorder (BIF)" (AR. 445). Dr. Newman concluded Ronnfeldt had a mild limitation in maintaining social functioning, but had no limitation in daily living, maintaining concentration, persistence, or pace, or decompensation (AR. 455).

On February 19, 2008, Ronnfeldt had a follow-up appointment at the Siouxland Community Health Center (AR. 465). The examiner noted Ronnfeldt was "[o]verall . . . quite

---

[2] The Global Assessment of Functioning (GAF) is a clinician's judgment of the individual's overall level of functioning, not including impairments due to physical or environmental limitations. **See** American Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders 30-32 (4th ed. text rev. 2000) (DSM-IV-TR). A GAF of 61 through 70 is characterized as some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships. **See id.** at 32.

well" (AR. 465).  Similarly, at Ronnfeldt's appointment with Dr. Gupta on April 2, 2008, Dr. Gupta noted Ronnfeldt was "doing much better" (AR. 896).

On April 12, 2008, St. Luke's Emergency Department admitted Ronnfeldt (AR. 469). Richard C. Brown, Jr., M.D. (Dr. Brown), was Ronnfeldt's attending physician (AR. 469). Ronnfeldt stated his family doctor, Michael L. Brenner, M.D. (Dr. Brenner), prescribed Zoloft three weeks prior to Ronnfeldt's admittance (AR. 469).  According to Ronnfeldt he had "changed," "it fel[t] like his mind [was] racing," and he felt "extra good" and "very up" (AR. 469).  Ronnfeldt stated he could not concentrate and his mind was "rambling on and on" (AR. 469).  Dr. Brown noted Ronnfeldt did not indicate he was depressed but stated "those around me told me I was" (AR. 470).  Dr. Brown noted Ronnfeldt was hypomanic and may have an underlying bipolar-type disorder (AR. 470).  Dr. Brown reduced Ronnfeldt's Zoloft and prescribed Seroquel to stabilize Ronnfeldt's mood fluctuations (AR. 471).   After an initial assessment, Dr. Brown assigned Ronnfeldt with a GAF score of 20[3] (AR. 471).  While at St. Luke's Ronnfeldt was monitored every fifteen minutes due to aggressive behavior (AR. 505-561).  The notes indicate Ronnfeldt was polite and friendly with the staff and came to St. Luke's to "straighten out" his medication (AR. 505-561).

On April 13, 2008, Julia S. Heaton, M.D. (Dr. Heaton), of St. Luke's attended Ronnfeldt (Ar. 472).  Dr. Heaton noted Ronnfeldt's chronic lung disease, hyperlipidemia, and sleep apnea (AR. 472).  Dr. Heaton assessed Ronnfeldt may have a possible bipolar disorder (AR. 472).  Dr. Heaton administered a round of antibiotics for Ronnfeldt's lung disease and informed Ronnfeldt to follow-up with Dr. Brenner (AR. 472).  Dr. Brown noted Ronnfeldt's condition slightly improved since admission at St. Luke's but was not totally stable (AR. 565).  Dr. Brown recommended Ronnfeldt stay at the hospital but Ronnfeldt

---

[3] A GAF of 11 through 20 is characterized as some danger of hurting self or others (e.g., suicide attempts without clear expectation of death; frequently violent; manic excitement) or occasionally fails to maintain minimal personal hygiene (e.g., smears feces) or gross impairment in communication (e.g., largely incoherent or mute).  **See** *id.* at 32.

declined (AR. 564-565).  Dr. Brown discharged Ronnfeldt with a GAF of 30[4] (AR. 483, 564-565).

On April 14, 2008, Ronnfeldt had an appointment with Dr. Brenner (AR. 869). Ronnfeldt reported "he feels on top of the word - better than he ever has before" although Ronnfeldt did feel anxious (AR. 869).  Ronnfeldt requested a Nicotine patch and reported he smoked marijuana since he was twenty-five years old but recently quit (AR. 869).  Dr. Brenner diagnosed Ronnfeldt with bipolar disorder and asthma with tobacco use (AR. 869). Ronnfeldt also had appointments with Dr. Brenner on April 21, 2008, and April 28, 2008 (AR. 869-870).  Ronnfeldt reported not feeling well and having trouble sleeping (AR. 869-870).  Dr. Brenner adjusted Ronnfeldt's medication and recommended Ronnfeldt adhere to the prescribed medication dosages (AR. 869-870).

On April 16, 2008, St. Luke's Emergency Department admitted Ronnfeldt because Ronnfeldt felt "he was going crazy" (AR. 768).  Rodney J. Dean, M.D. (Dr. Dean), was the attending physician (AR. 768-769).  Dr. Dean diagnosed bipolar I disorder, mixed type with psychosis, and ruled out mild mental retardation (AR. 768).  Dr. Dean assigned Ronnfeldt a GAF score of 39[5] (AR. 768).  On April 18, 2008, Dr. Dean discharged Ronnfeldt (AR. 861-865).  Dr. Dean noted Ronnfeldt significantly improved and assigned a GAF score of 68 (AR. 864).

On May 2, 2008, Ronnfeldt had an appointment with Dr. Gupta (AR. 897).  Dr. Gupta noted Ronnfeldt's lungs were doing well, he had some symptoms of restless leg syndrome, but otherwise did not have any complaints (AR. 897).  Dr. Gupta continued Ronnfeldt's medication (AR. 897).

On May 6, 2008, Ronnfeldt had an appointment with Dr. Brenner (AR. 870). Ronnfeldt reported he was "feeling well" (AR. 870).  Dr. Brenner noted Ronnfeldt had no

---

[4] A GAF of 21 through 30 is characterized as behavior is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal, preoccupation) or inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends).  **See *id.* at 32.**

[5] A GAF of 31 through 40 is characterized as some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school). **See *id.* at 32.**

acute problems and maintained his diagnosis of bipolar disorder (AR. 870).  On May 21, 2008, Ronnfeldt had a follow-up appointment with Dr. Brenner (AR. 875).  Ronnfeldt reported he felt he was back to his "baseline" and had little memory of what occurred in the prior month and a half (AR. 875).  Dr. Brenner noted Ronnfeldt's improvement and continued Ronnfeldt's medications (AR. 875).  Dr. Brenner recommended Ronnfeldt schedule a follow-up appointment in three to four months or sooner if problems exacerbated or new problems developed (AR. 875).

Ronnfeldt saw Dr. Brenner on July 23, 2008, for an appointment (AR. 875). Ronnfeldt complained of wheezing and shortness of breath (AR. 875).  Dr. Brenner diagnosed asthma exacerbation/bronchitis and well-controlled hyperlipidemia (AR. 875). Dr. Brenner noted no acute distress, continued Ronnfeldt's medications, and prescribed antibiotics for the bronchitis (AR. 875).

On June 4, 2008, psychiatrist Dr. Fuller, completed a psychiatric evaluation of Ronnfeldt (AR. 567-568). Dr. Fuller noted Ronnfeldt's mood appeared euthymic, very mildly hypomanic, and very oriented (AR. 568).  Dr. Fuller noted Ronnfeldt's concentration, abstract thinking, and insight were questionable (AR. 568). Dr. Fuller diagnosed Ronnfeldt with a type I bipolar disorder, low intellectual functioning, possible attention deficit disorder, and assigned a GAF score of 45-50[6] (AR. 568).

On June 19, 2008, Dr. Fuller completed a PRT and MRFCA (AR. 575).  Dr. Fuller noted Ronnfeldt had a category 12.04 affective disorder as evidenced by a disturbance of mood, manic syndrome, and a bipolar syndrome (AR. 577-578).  Dr. Fuller concluded Ronnfeldt had a marked limitation in maintaining social functioning, a moderate limitation in activities of daily living, and four or more episodes of decompensation (AR. 585).  Dr. Fuller noted Ronnfeldt's limitation in maintaining concentration, persistence, or pace varies between moderate and marked (AR. 585).  In the MRFCA, Dr. Fuller determined Ronnfeldt had a marked limitation in the following categories:  ability to carry out detailed instructions; ability to maintain attention and concentration for extended periods; ability to perform

---

[6] A GAF score of 41 through 50 is characterized as serious symptoms (e.g., suicidal ideation, several obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job).  See *id.* at 32.

11

activities within a schedule, maintain regular attendance, and be punctual; ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes (AR. 601-602).  Dr. Fuller noted Ronnfeldt had moderate limitations in the following categories:  ability to carry out very short and simply instructions; ability to work in coordination with or proximity to others without being distracted by them; ability to interact appropriately with the general public; and ability to accept instructions and respond appropriately to criticism from supervisors (AR. 601-602).  Dr. Fuller determined Ronnfeldt was not significantly limited in the remaining categories (AR. 601-602).

On July 11, 2008, Ronnfeldt saw Dr. Fuller for a follow-up appointment (AR. 569). Ronnfeldt reported dramatic improvement in his ability to function and had been able to fish (AR. 569).  Dr. Fuller noted Ronnfeldt "had no episodes of major ups in his mood or major downs in his mood" and he was "actually feeling quite good" (AR. 569).  Dr. Fuller continued Ronnfeldt's medications and assigned a GAF score of 45-50 (AR. 570).

On August 4, 2008, Ronnfeldt had an appointment with Dr. Gupta (AR. 897).  Dr. Gupta noted Ronnfeldt was doing "okay" but had some problems with humidity (AR. 897). Dr. Gupta continued Ronnfeldt's current management of medication (AR. 897).

On August 13, 2008, Ronnfeldt saw Dr. Brenner due to a cough and congestion (AR. 879).  Dr. Brenner noted Ronnfeldt's asthma was well controlled and diagnosed bronchitis (AR. 879).  Dr. Brenner prescribed antibiotics for Ronnfeldt's bronchitis (AR. 879).  On October 3, 2008, Ronnfeldt complained to Dr. Brenner of increased problems with wheezing, chest tightness, and shortness of breath (AR. 882).  Ronnfeldt stated he typically does very well on his medications but when he contracts bronchitis he becomes worse (AR. 882).  Dr. Brenner diagnosed Ronnfeldt with asthma exacerbation and provided Ronnfeldt with antibiotics (AR. 882).  On November 19, 2008, Ronnfeldt had a follow-up appointment with Dr. Brenner (AR. 885).  Dr. Brenner noted Ronnfeldt was "doing well" and had no acute complaints, concerns, or distress (AR. 885).

Ronnfeldt saw Dr. Fuller for a follow-up visit on December 3, 2008 (AR. 571). Ronnfeldt reported he was "feeling good" and has had "no real swings of ups or downs in

his mood" (AR. 571).  Dr. Fuller continued Ronnfeldt's medications and assigned a GAF score of 50 (AR. 572).

On January 27, 2009, Ronnfeldt saw Dr. Gupta for an evaluation of Ronnfeldt's asthma and chronic obstructive pulmonary disease (AR. 898).  Dr. Gupta noted Ronnfeldt was no longer smoking and was doing quite well (AR. 898).  Dr. Gupta also noted Ronnfeldt was tolerating his CPAP very well (AR. 898).  Dr. Gupta continued Ronnfeldt's medication and advised Ronnfeldt to perform some form of aerobic exercise (AR. 898).

On March 18, 2009, Ronnfeldt saw Dr. Brenner for a follow-up appointment and for fasting lab work (AR. 887).  Dr. Brenner noted Ronnfeldt had no acute complaints or concerns and his mood was stable (AR. 887).  Dr. Brenner noted the lab work showed elevated triglycerides and began Ronnfeldt on medication to lower the triglycerides (AR. 887).

On April 17, 2009, Ronnfeldt had a follow-up medication management appointment with Dr. Fuller (AR. 604).  Dr. Fuller noted Ronnfeldt was "doing well" with the exception of two problems:  "thirty-pounds of weight gain [and] a lot of anxiety and depressive residual symptoms" (AR. 604).  Dr. Fuller noted Ronnfeldt was otherwise much better than he was previously but there was still "a lot to be desired" (AR. 604).  Dr. Fuller assigned a GAF score of 50 and maintained the diagnosis of type I bipolar disorder, low intellectual functioning, and possible attention deficit disorder (AR. 605, 906).

On May 12, 2009, as part of his appointment with Dr. Brenner, Ronnfeldt completed a Patient Health Questionnaire (PHQ), answering a series of questions regarding any problems in the past two weeks (AR. 888).  Ronnfeldt marked "Not at all," or zero out of four, to the following questions:  1) Feeling down, depressed, or hopeless?; 2) Little interest or pleasure in doing things?; 6) Feeling bad about yourself, or that you are a failure or have let yourself or your family down?; 7) Trouble concentrating on things, such as reading the newspaper or watching television?; 8) Moving or speaking so slowly that other people could have noticed? Or the opposite–being fidgety or restless that you have been moving around a lot more than usual?; 9) Thoughts that you would be better off dead or hurting yourself in some way? (AR. 888).  Ronnfeldt marked "Several Days," or one out of four, to the following questions:  3) Trouble falling or staying asleep, or sleeping too much?; 4) Feeling tired or

13

having little energy?; 5) Poor appetite or overeating? (AR. 888).  When asked how difficult Ronnfeldt's problems have made it for him to work, take care of things, or get along with other people, Ronnfeldt marked "Not difficult at all" (AR. 888).  Ronnfeldt did mark he had felt depressed or sad most days, even if he felt okay sometimes (AR. 888).

Dr. Gupta evaluated Ronnfeldt on July 17, 2009 (AR. 898).  Dr. Gupta noted Ronnfeldt was using the CPAP every night and was "okay" (AR. 898).  Dr. Gupta noted Ronnfeldt's asthma with Chronic Obstructive Pulmonary Disease (COPD) was relatively stable and continued Ronnfeldt on his medications (AR. 898).

On July 17, 2009, Ronnfeldt saw Dr. Fuller for another follow-up medication management appointment (AR. 606).  Ronnfeldt reported "he is getting along quite well" and "overall his life is going well" (AR. 606).  Dr. Fuller noted Ronnfeldt was having no problems at all with mania or depression and no significant side effects (AR. 606).  Dr. Fuller continued Ronnfeldt on his medication and assigned a GAF score of 50 (AR. 606-607, 907-908).

Dr. Fuller evaluated Ronnfeldt on October 16, 2009, for a follow-up medication management appointment (AR. 909-910).  Ronnfeldt reported he has not had any specific upswings in his mood, no problems with sleeping, and no severe depressive symptoms (AR. 909).  Dr. Fuller noted Ronnfeldt continued to describe a lot of dramatic social anxiety disorders, which had only improved slightly (AR. 909).  Dr. Fuller noted Ronnfeldt was euthymic, fully oriented, and assigned a GAF score of 50 (AR. 909-910).

On January 6, 2010, Ronnfeldt saw Dr. Fuller for an appointment (AR. 911-912).  Dr. Fuller noted Ronnfeldt kept all of his sessions, attended case management, and was doing quite well, overall,  (AR. 911).  Dr. Fuller assigned Ronnfeldt a GAF score of 55[7] (AR. 911).  On January 13, 2010, Ronnfeldt had an appointment with Dr. Gupta (AR. 959).  Ronnfeldt reported he was not able to exercise due to the weather but had no specific complaints and was doing quite well (AR. 959).  Dr. Gupta advised Ronnfeldt to watch his weight and continue aerobic exercises (AR. 959).

---

[7]  A GAF score of 51 through 60 is characterized as moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g. few friends, conflicts with peers or co-workers).  **See *id.* at 32.**

On February 2, 2010, Ronnfeldt met with a community support worker, Jessica Barclay (Ms. Barclay), for the first time (AR. 993). Ms. Barclay noted Ronnfeldt was doing well (AR. 993). Thereafter, Ronnfeldt met with Ms. Barclay eighteen times until August 24, 2010 (AR. 994-1011). Generally, Ms. Barclay noted Ronnfeldt was doing well, was anxious about his disability hearing, and was ready to go outdoors and fish (AR. 994-1011). Ms. Barclay noted Ronnfeldt was able to fish, mow his lawn, and take care of his mother (AR. 994-1011). During his August 24, 2010, appointment with Ms. Barclay, Ronnfeldt reported he had lost fifty-five pounds and he "fel[t] great, and want[ed] to keep going" with the weight-loss (AR. 1011). Ms. Barclay noted Ronnfeldt looked much better and healthier (AR. 1011).

Dr. Brenner evaluated Ronnfeldt on March 30, 2010 (AR. 957). Dr. Brenner noted Ronnfeldt had no complaints at the time of the appointment although he did gain twelve pounds (AR. 957). Dr. Brenner continued Ronnfeldt's medications and restarted him on Lipitor (AR. 957).

On April 7, 2010, Ronnfeldt had an appointment with Dr. Fuller (AR. 1027-1028). Ronnfeldt reported he continued to function reasonably well and "overall [was] doing very well" (AR. 1027). Ronnfeldt reported he had gone fishing at his cabin in Yankton, South Dakota (AR. 1027). Dr. Fuller noted Ronnfeldt was currently euthymic and his social anxiety disorder improved (AR. 1027). Dr. Fuller assigned Ronnfeldt a GAF score of 55 (AR. 1027). Dr. Fuller evaluated Ronnfeldt twice more on July 7, 2010, and October 29, 2010 (AR. 1029-1031). Dr. Fuller noted Ronnfeldt "seems to function adequately" and assigned a GAF score of 50 on both appointments (AR. 1029-1031). Also on July 7, 2010, Dr. Fuller wrote a letter to Ronnfeldt's attorney with regard to Ronnfeldt's work capacity (AR. 1037-1040). Dr. Fuller stated Ronnfeldt carries a diagnosis of bipolar disorder and due to the nature of the disorder, Ronnfeldt fluctuates between being able to work and being manic and depressive and therefore unable to work (AR. 1037-1040).

Ronnfeldt continued to meet with several community support workers from October 26, 2010, through March 22, 2011 (AR. 1012-1026). During these meetings, Ronnfeldt discussed his medications and outdoor activities such as fishing and hunting turkey (AR. 1012-1026).

**B.      Administrative Hearing**

At his administrative hearing on April 16, 2010, Ronnfeldt testified a typical day for Ronnfeldt involves taking a shower after waking up, eating breakfast, watching television, and visiting his parents (AR. 50). Ronnfeldt testified he does not do any activities with other people outside the group of three friends he has had for around twenty years (AR. 65-66). Ronnfeldt testified he hunted in the past but stopped due to his lung issues (AR. 48). Ronnfeldt testified he had no interest in activities other than fishing (AR. 50, 59-60). Ronnfeldt fishes with his brother, nephew, and one of his friends, but cannot fish alone because it is too difficult. (AR. 58, 66).

Ronnfeldt testified going out in public makes him nervous (AR. 45). In order to avoid a crowd, Ronnfeldt shops at Wal-Mart in the morning (AR. 54). Ronnfeldt testified he has had limited contact with the public; for example, he never visited the Sioux City Mall, never stayed at a hotel, and only went to one concert in the 1970s (AR. 45-46, 47-48, 59, 63). Ronnfeldt testified his problem of not going out in public worsened since he lost his job (AR. 49).

Although Ronnfeldt has had issues with going out in public for the last twenty or thirty years, Ronnfeldt was able to work (AR. 49). Ronnfeldt testified during work he performed repetitious tasks and would lift a hundred pounds or more on a regular basis (AR. 43, 64). As a machine worker at EEC, Ronnfeldt worked alone; however, as a concrete finisher, Ronnfeldt generally worked with others (AR. 49).

Ronnfeldt testified he developed a lung injury due to breathing smoke and fumes at the plastic plant and, due to his lung issues, he lost his job, along with his health insurance, in July 2006 (AR. 43-44, 56). At the time of the hearing, Ronnfeldt was on Advair discus, Singulair, and a Proventil inhaler for treatment of his lung issues (AR. 43-44). Worker's compensation benefits paid for the medications (AR. 44).

Prior to Ronnfeldt's April 12, 2008, hospitalization, Ronnfeldt had never sought mental counseling (AR. 49). Ronnfeldt testified he visits Dr. Fuller for mental problems and takes Abilify, Depakote ER, Lexapro, and Temazepam (AR. 44). Temazepam, a sleeping pill, helps Ronnfeldt sleep an uninterrupted seven- or eight-hours a night, three or four nights a week (AR. 44). In addition to medication, Ronnfeldt uses a CPAP machine to help

16

sleep (AR. 52).  On the nights Ronnfeldt does have issues sleeping, Ronnfeldt sleeps four to five hours, is tired the next day, and sometimes takes naps (AR. 52).  Ronnfeldt testified he would not be able to work a forty-hour week without taking naps due to poor sleep (AR. 52).

In addition to chest related issues, Ronnfeldt testified he suffered from arthritis (AR. 52-53).  Ronnfeldt testified Dr. Fuller and Dr. Folchert diagnosed Ronnfeldt with arthritis and he has had arthritis in his hands for five or six years (AR. 52-53).  Ronnfeldt was prescribed Naprozen for arthritis (AR. 53).  Ronnfeldt also took Lipitor and Lovaza for his cholesterol (AR. 53).

Ronnfeldt testified he could lift ten pounds and could walk a block without stopping (AR. 51).  Ronnfeldt stated he suffers shortness of breath if he walks farther than one block without stopping (AR. 51).  Although Ronnfeldt could climb stairs to the basement and back, Ronnfeldt cannot climb a hill due to shortness of breath (AR. 51).  Ronnfeldt testified he could stand in one spot for around an hour and could sit in one spot for a couple of hours (AR. 52).  Ronnfeldt testified he would not be able to perform a job that requires him to push or pull with his arms continuously due to right arm surgery (AR. 53, 55-56).  Ronnfeldt has problems with the cold, hot, and humid weather due to his lungs (AR. 54).  However, Ronnfeldt does not have any problems bending, getting something off the floor, and reaching up high (AR. 56).  Further, Ronnfeldt could work in proximity with others and do activities with others (AR. 61).

Ronnfeldt testified he had difficulty concentrating and thinking because his mind wanders (AR. 60).  However, Ronnfeldt stated his attention and concentration were good (AR. 60).  Ronnfeldt could watch a two-hour movie and understand what happened in the movie (AR. 60).  Ronnfeldt testified he could not work due to his lungs (AR. 65).  Ronnfeldt testified he could not work as a clerk at 7-Eleven or a movie theater because he could not use a register because he is not smart enough and being around other people would bother him (AR. 65).  Ronnfeldt testified he did not have goals for the future neither before nor after his lung injury (AR. 64).

Thomas England, M.D. (Dr. England), testified as a medical expert at the administrative hearing (AR. 67).  Dr. England testified the medical evidence of record did

17

not establish Ronnfeldt had a mental health condition until January 24, 2008, as opposed to the alleged onset date of August 11, 2006 (AR. 67). Dr. England testified Ronnfeldt was assigned a GAF score of 65-70 and was diagnosed with adjustment disorder on January 24, 2008 (AR. 67). Dr. England testified the first indication of a severe mental health condition was on April 18, 2008, when Ronnfeldt was admitted to the hospital and was assessed with a bipolar condition (AR. 67). Dr. England noted there was no indication in the record that, prior to the April 18, 2008, hospital visit, depression or other mental conditions were discussed or treated (AR. 67).

Dr. England further testified the record reflects Ronnfeldt had BIF and suffered from social avoidance or social phobia (AR. 68-69). Dr. England testified Ronnfeldt had symptoms of loss of interest in activities, some psychomotor retardation, some difficulties concentrating, mild paranoia, and sleep disturbance (AR. 70). Dr. England stated Ronnfeldt also exhibited a fear of social groups and had a tendency to isolate socially (AR. 70). Dr. England testified Ronnfeldt had a mild limitation on understanding, remembering, and carrying out short and simple instructions, a moderate restriction on understanding and remembering detailed instructions, and, if instructions were sufficiently complex, a marked limitation on carrying out detailed instructions (AR. 70-71). Dr. England also testified Ronnfeldt had a mild limitation on his ability to make judgments on simple work-related decisions and only a mild limitation on activities of daily living because Ronnfeldt lives independently (AR. 71, 73). Dr. England opined Ronnfeldt would have a moderate limitation with interacting appropriately with the public and would have a marked limitation if interaction was with a sufficiently large number or for an extended period of time (AR. 71-72). A sufficiently large number would be six or more people and an extended period of time is a few minutes to an hour according to Dr. England (AR. 72). Dr. England testified Ronnfeldt would only have a mild limitation on maintaining social functioning if he was with familiar individuals (AR. 73).

Dr. England opined Ronnfeldt had moderate difficulties in maintaining concentration, persistence, and pace (AR. 74). Dr. England testified Ronnfeldt had moderate limitations in the following categories:  interacting appropriately with a supervisor, interacting with coworkers, responding appropriately to work pressure in a usual work setting, responding

18

to changes in a routine work setting, maintaining social functioning (AR. 72-73).   Dr. England testified he did not see an indication of episodes of decompensation (AR. 74).   Dr. England testified that, assuming Ronnfeldt's testimony was true, Ronnfeldt does not meet the criteria for agoraphobia (AR. 77).   Dr. England stated agoraphobia pertains more to simply being outside a protected environment and it does not involve groups, social activities, or social contact (AR. 77).   Dr. England testified Ronnfeldt could use public transportation but it would certainly be something Ronnfeldt would avoid (AR. 78).   Dr. England testified Ronnfeldt, with the above-mentioned limitations, would need to work a three-step job (AR. 71).

Dr. England testified there was no medical evidence of anxiety but it was possible it existed to some extent (AR. 78).   Dr. England stated the onset of bipolar conditions generally begins in adolescence and early adulthood and not the age Ronnfeldt began showing symptoms (AR. 78).   Thus, according to Dr. England, Ronnfeldt may have had anxiety before, but not to the degree it was subsequent to his lung ailment, isocyanide-induced asthma, and unemployment (AR. 78).

Dr. England testified he agreed with Dr. Fuller's evaluation that Ronnfeldt had a marked limitation in the ability to carry out detailed instructions (AR. 97).   Dr. England further agreed with Dr. Fuller that Ronnfeldt had a marked limitation in the following categories only if Ronnfeldt were in a situation where he interacted with six or more people:   ability to maintain attention and concentration for extended periods; ability to perform activities within a schedule, maintain regular attendance, and be punctual; the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes (AR. 96-97).

Dr. England testified he otherwise disagreed with Dr. Fuller's remaining opinions because Dr. Olwan assigned Ronnfeldt a much higher GAF score than Dr. Fuller and by the time Ronnfeldt was discharged from the hospital in April of 2008, Ronnfeldt's GAF increased to 68 from the 20 to 30 range (AR. 75).   Additionally, according to Dr. Brenner's notes, Dr. England noted there was clear improvement relatively quickly with regard to

depression and Dr. Fuller's notes stated Ronnfeldt's bipolar condition was euthymic (AR. 75-76). Dr. England testified it was possible Dr. Olwan did not ask some specific questions with regard to Ronnfeldt's social anxiety issues and there were tests Dr. Olwan could have done to better detail Ronnfeldt's social anxiety disorder (AR. 78-81). However, Dr. England testified Dr. Olwan's assessment was a general mental status assessment combined with a cognitive assessment, which focused on cognitive conditions and not necessarily emotional or anxiety-related conditions (AR. 81).

Gail Leonhardt, a vocational expert (VE), testified at the administrative hearing (AR. 83). The VE, before testifying, asked the ALJ to clarify Ronnfeldt's work history after 1995 (AR. 84). Ronnfeldt testified since 1995, he worked in the plastics plant (AR. 84). After clarifying Ronnfeldt's work history, the ALJ posed a hypothetical question to the VE that reflected Ronnfeldt's age, education, work experience, and medical history (AR. 85-86). The ALJ asked whether the hypothetical individual could perform Ronnfeldt's past relevant work (AR. 85). The VE testified the hypothetical individual could not perform past relevant work due to the exposure to plastic fumes (AR. 85). Further, the VE testified the hypothetical individual's work was unskilled and therefore he did not have any transferrable skills (AR. 85). However, the VE did testify the hypothetical individual with a light RFC with avoidance of fumes, vibrations, cold, heat, and BIF could work in the national economy (AR. 86). The VE testified the hypothetical individual could perform unskilled, light production work (AR. 86). The VE testified the hypothetical individual could not multi-task but could work a three-step job (AR. 91-92). Specifically, the hypothetical individual could function as a production assembler or hand packager at the light exertional level (AR. 86-87). The VE testified there are 4,230 jobs as a production assembler within Iowa, Nebraska, Missouri, and Kansas and 83,384 jobs in the United States (AR. 87). The VE testified there are 14,448 jobs as a hand packager within Iowa, Nebraska, Missouri, and Kansas and 319,694 jobs in the United States (AR. 87). The VE relied on facts and figures from the Occupational Employment Quarterly published by United States Publishing, which relies on the Department of Labor's figures and information (AR. 87).

The ALJ asked the VE whether the hypothetical individual could perform as a production assembler or hand packager if the individual's limitations were moderate but

20

became marked if around six or more people for a few minutes to an hour in the following categories: interaction with the public, interaction with coworkers, ability in maintaining social functioning, and ability in maintaining concentration, persistence, and pace (AR. 87-88).  The VE testified the hypothetical individual could still perform work as a production assembler or hand packager with the above restrictions (AR. 87).  The VE explained work as a production assembler or hand packager would include only superficial interaction with others and would not require more than occasional interaction with one supervisor monitoring the individual's work (AR. 88).  The VE testified as a production assembler and hand packager the hypothetical individual would not associate with other workers on the line (AR. 90).

Ronnfeldt's attorney asked the VE an additional question limiting the hypothetical individual to someone with all marked limitations in the above categories (AR. 89).  The VE testified that in the jobs recommended, the hypothetical individual would be able to function because the jobs do not place the hypothetical individual in a situation where the limitations would rise to marked limitations (AR. 88-89).  The VE testified the hypothetical individual with a moderate limitation in concentration, persistence, and pace would not impact the individual's ability to work as production assembler or hand packager (AR. 92).  However, if the limitations were marked, the VE testified there would be an impact (AR. 89, 92-93).

The VE opined an individual with a marked limitation on the ability to complete a normal workday or workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods would eliminate work as a production assembler or hand packager (AR. 94).  The VE opined a marked inability to get along with coworkers without distracting them or exhibiting behavioral extremes would interfere or stop the hypothetical individual's ability to perform work as a production assembler or hand packager (AR. 94).  The VE also opined an individual with a marked limitation in the ability to maintain attention and concentration for extended periods and a marked limitation in the ability to perform activities within the schedule, maintain regular attendance, and be punctual would eliminate employability (AR. 94-95). Ronnfeldt's attorney asked the VE whether the hypothetical individual could work a 40-hour week if he had to nap during the day (AR. 91).  The VE testified the hypothetical

individual could not work if he had to take breaks other than the prescribed breaks (AR. 91).

Ronnfeldt's attorney asked the VE whether the three-step jobs available to the hypothetical individual are being moved overseas or becoming automated (AR. 92-93). The VE testified there have been some reports that three-step jobs such as production assembler and hand packager are being moved overseas (AR. 92-93). Additionally, the VE testified there are trends in the employment market to moves three-step jobs to automation (AR. 93). However, the VE testified jobs as a production assembler or hand packager presently exist (AR. 93). Ronnfeldt's attorney asked the VE whether employers generally avoid hiring individuals with six or more moderate limitations (AR. 93). The VE responded that was not necessarily true because the moderate limitations may not simultaneously impact the individual (AR. 93).

### THE ALJ'S DECISION

The ALJ concluded Ronnfeldt was not disabled under the Act (AR. 16). The ALJ framed the issue as whether Ronnfeldt was disabled under sections 216(i) and 223(d) of the Act (AR. 16). The ALJ defined disability as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment or combination of impairments that can be expected to result in death or last for a continuous period of not less than twelve months (AR. 16). **See** 42 U.S.C. § 423; 20 C.F.R. § 404.1505. The ALJ noted there is an additional issue whether the insured status requirements of sections 216(i) and 223(d) of the Act are met (AR. 16). The ALJ determined Ronnfeldt met the insured status requirements of the Act (AR. 18).

The ALJ must evaluate a disability claim according to the sequential five-step analysis established by the Social Security regulations. **See** 20 C.F.R. § 404.1520(a)-(f); *Jones v. Astrue*, 619 F.3d 963, 968 (8th Cir. 2010).

> During the five-step process, the ALJ considers (1) whether the claimant is gainfully employed, (2) whether the claimant has a severe impairment, (3) whether the impairment meets the criteria of any Social Security Income listings, (4) whether the impairment prevents the claimant from performing past relevant work, and (5) whether the impairment necessarily prevents the claimant from doing any other work.

*Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (citation omitted); **see** *Kluesner v. Astrue*, 607 F.3d 533, 536 (8th Cir. 2010).  More specifically, the ALJ examines:

> [A]ny current work activity, the severity of the claimant's impairments, the claimant's residual functional capacity and age, education and work experience.  **See** 20 C.F.R. § 404.1520(a).  If the claimant suffers from an impairment that is included in the listing of presumptively disabling impairments (the Listings), or suffers from an impairment equal to such listed impairment, the claimant will be determined disabled without considering age, education, or work experience.  If the Commissioner finds that the claimant does not meet the Listings but is nevertheless unable to perform his or her past work, the burden of proof shifts to the Commissioner to prove, first, that the claimant retains the residual functional capacity to perform other kinds of work, and, second, that other such work exists in substantial numbers in the national economy.  A claimant's residual functional capacity is a medical question.

*Singh v. Apfel*, 222 F.3d 448, 451 (8th Cir. 2000) (internal citations omitted).  "If a claimant fails to meet the criteria at any step in the evaluation of a disability, the process ends and the claimant is determined to be not disabled."  *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006) (citation omitted); **see** *Kluesner*, 607 F.3d at 536.

In this case, the ALJ followed the appropriate sequential analysis.  At step one, the ALJ determined Ronnfeldt did not engage in substantial and gainful activity after Ronnfeldt stopped working on August 10, 2006 (AR. 18).  At step two, the ALJ determined Ronnfeldt had the following severe impairments as defined by Social Security regulations: "asthma, sleep related breathing disorder, COPD, borderline intellectual functioning, bipolar disorder, and social phobia" (AR. 18).  The ALJ determined the above-mentioned severe impairments cause more than minimal limitations in Ronnfeldt's ability to perform basic work-related activities (AR. 18).  Although the ALJ determined Ronnfeldt's obesity, back problems, arthritis, history of right elbow surgery, and restless leg syndrom were non-severe, the ALJ did consider the limiting effects of such impairments (AR. 18-19).

At the third step, the ALJ determined Ronnfeldt does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525 and 404.1526) (AR. 19).  Before proceeding to step four of the sequential evaluation process,

but after careful consideration of the entire record, the ALJ determined Ronnfeldt's ability to perform work-related functions, or a residual functional capacity (RFC), is limited to the following:

> [Ronnfeldt can] lift 20 pounds occasionally and 10 pounds frequently.  He can occasionally climb but should avoid exposure to ammonia and plastic fumes; avoid even moderate exposure to fumes, odors, dusts, and gases; and avoid concentrated exposure to extreme cold or heat, humidity, and vibration.  [Ronnfeldt] has moderate limitation in the ability to interact with the public or co-workers but could have marked limitation with extended periods of contact or around 6 people or more for a few minutes to an hour.  Due to his borderline intellectual functioning and other mental impairments, [Ronnfeldt] is limited to short, simple, repetitive, 1-2-3 step jobs.  [Ronnfeldt] has moderate restriction in maintaining social functioning and concentration, persistence, or pace but this restriction would rise to the marked level if around a large group of 6 or more people for a few minutes to an hour.

(AR. 20).

The ALJ found Ronnfeldt's medically determinable impairments could reasonably be expected to cause Ronnfeldt's alleged symptoms; however, the ALJ found Ronnfeldt's statements regarding the intensity, persistence, and limiting effects of such symptoms were not credible to the extent Ronnfeldt's statements are inconsistent with the ALJ's RFC assessment (AR. 21).  The ALJ gave great weight to the state agency medical consultants Drs. Hohensee's and Reed's opinions that Ronnfeldt could perform light work with only occasional climbing and no exposure to extreme temperatures or fumes, odors, dusts, and gases (AR. 21).  The ALJ also gave great weight to Dr. England's consulting opinion, which discounted Dr. Fuller's opinions, because Dr. England's opinions were supported by the evidence, his professional expertise, and the record as whole (AR. 25).  The ALJ further gave substantial weight to the opinions of Drs. Gupta, Von Essen, and Fuortes as their opinions support the ALJ's RFC and are consistent with the record as a whole (AR. 25).  The ALJ did not give great weight to state agency psychological consultant Dr. Newman because evidence received at the hearing level supported a finding that Ronnfeldt's mental impairments are severe (AR. 21).  The ALJ found that although the record reflects Ronnfeldt received treatment for respiratory problems and mental impairments, the evidence failed

to support a finding of disability because Ronnfeldt's alleged symptoms are inconsistent with the objective medical evidence and Ronnfeldt's own statements (AR. 21-22). The ALJ gave some weight to Dr. Olwan's opinions but did not give great weight to Dr. Fuller's opinions because Dr. Fuller's opinions were inconsistent with his treatment notes and the record as a whole (AR. 23-24). The ALJ noted the overall record does not have sufficient evidence of functional limitations that would preclude Ronnfeldt from being able to work based on objective findings, adequate relief with treatment, and Ronnfeldt's description of daily activities (AR. 25).

At step four of the sequential evaluation process, the ALJ determined Ronnfeldt is unable to perform his past relevant work as an injection-molding machine tender (AR. 25). The ALJ noted Ronnfeldt was 50 years old on the alleged disability onset date, which qualifies Ronnfeldt as an individual closely approaching advanced age under 20 C.F.R § 404.1563 (AR. 25). The ALJ also noted Ronnfeldt has a limited ninth grade education but is able to communicate in English (AR. 26). The ALJ noted Ronnfeldt's past relevant work is unskilled thus his job skills are not transferable (AR. 26).

At the final step in the process, the ALJ determined jobs exist in significant numbers in the national economy that Ronnfeldt can perform (AR. 26). The ALJ relied upon the VE's testimony finding a person of Ronnfeldt's age, education, work experience, and RFC could perform light, unskilled work as a production assembler and hand packager (AR. 26). The ALJ determined that because Ronnfeldt could perform unskilled light labor, Ronnfeldt was not disabled (AR. 26-27).

Ronnfeldt appeals the Commissioner's determination on five grounds. Ronnfeldt argues the ALJ (1) failed to give controlling weight to the opinions of the treating psychiatrist, Dr. Fuller; (2) erred in finding Ronnfeldt could perform "medium work" even though the ALJ limited the claimant to "light work"; (3) erred in finding Ronnfeldt could perform work as a production assembler without consideration of Ronnfeldt's credible postural limitations; (4) failed to fairly and fully develop the medical evidence by failing to obtain work-related mental limitations from a treating or examining medical source; and (5) failed to fully and fairly develop the record regarding Ronnfeldt's literacy. **See** Filing No. 18 - Plaintiff's Brief p. 12-27. The court will review, seriatim, each issue below.

## STANDARD OF REVIEW

A district court is authorized jurisdiction to review a decision to deny disability benefits according to 42 U.S.C. § 405(g). A district court is to affirm the Commissioner's findings if "supported by substantial evidence on the record as a whole." *Johnson v. Astrue*, 628 F.3d 991, 992 (8th Cir. 2011). Substantial evidence is defined as less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision. *Jones v. Astrue*, 619 F.3d 963, 968 (8th Cir. 2010); **see also** *Minor v. Astrue*, 574 F.3d 625, 627 (8th Cir. 2009) (noting "the 'substantial evidence on the record as a whole' standard requires a more rigorous review of the record than does the 'substantial evidence' standard"). "If substantial evidence supports the decision, then [the court] may not reverse, even if inconsistent conclusions may be drawn from the evidence, and even if [the court] may have reached a different outcome." *McNamara v. Astrue*, 590 F.3d 607, 610 (8th Cir. 2010). "[I]t is the court's duty to review the disability benefit decision to determine if it is based on legal error." *Nettles v. Schweiker*, 714 F.2d 833, 835-36 (8th Cir. 1983). The court reviews questions of law de novo. **See** *Miles v. Barnhart*, 374 F.3d 694, 698 (8th Cir. 2004). Findings of fact are considered conclusive if supported by substantial evidence on the record as a whole. **See** *Nettles*, 714 F.2d at 835; *Renfrow v. Astrue*, 496 F.3d 918, 920 (8th Cir. 2007). Furthermore, "[the court] defer[s] to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence." *Pelkey*, 433 F.3d at 578 (**quoting** *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005)).

## DISCUSSION

**A.    Dr. Fuller's Opinion**

Ronnfeldt argues the ALJ incorrectly weighed the opinion of a non-examining and non-treating expert greater than the opinion of a treating physician. *See* Filing No. 18 - Brief p. 12. Ronnfeldt asserts the testifying doctor, Dr. England, never examined nor treated Ronnfeldt, therefore Dr. England's opinion should not be allotted greater weight in place of Dr. Fuller's opinion. *Id.* at 16. Ronnfeldt contends Dr. England, as a non-examining and non-treating expert, was unable to accurately assess the record as a whole. *Id.* at 19.

26

Ronnfeldt also asserts the ALJ incorrectly concluded inconsistencies existed between Dr. Fuller's opinions and his treatment notes. *Id.* Ronnfeldt argues Dr. Fuller's treatment notes and opinions are consistent and reflect Ronnfeldt suffers from a bipolar disorder, low intellectual functioning, and social phobia. *Id.* at 20. Ronnfeldt asserts simply because he shows some improvement does not mean he is not disabled. **See** Filing No. 25 - Reply p. 2.

A treating physician's opinion is generally given greater weight if it is consistent with other substantial evidence and medically accepted clinical and laboratory diagnosis support the opinion. *Perkins v. Astrue*, 648 F.3d 892, 897 (8th Cir. 2011). However, "[a] treating physician's opinion does not automatically control, since the record must be evaluated as a whole." *Id.* The treating physician's opinion may be discounted or disregarded by the ALJ when the credibility of the treating physician's opinion is undermined by the physician's own inconsistent opinions or the opinion is inconsistent with the medical evidence as a whole. *Halverson v. Astrue*, 600 F.3d 922, 931 (8th Cir. 2010); **see also** *Martise v. Astrue*, 641 F.3d 909, 925 (8th Cir. 2011) ("An ALJ may justifiably discount a treating physician's opinion when that opinion is inconsistent with the physician's clinical treatment notes."). "It is the ALJ's function to resolve conflicts among the opinions of various treating and examining physicians." *Wagner v. Astrue*, 499 F.3d 842, 848 (8th Cir. 2007) (**quoting** *Pearsall v. Massanari*, 274 F.3d 1211, 1219 (8th Cir. 2001)). When the ALJ evaluates a non-examining physician's opinion the regulations provide the ALJ "evaluate[s] the degree to which these opinions consider all of the pertinent evidence in [the] claim, including opinions of treating and other examining sources." 20 C.F.R. § 404.1527(d)(3).

Substantial evidence in the record supports the ALJ's decision to discount Dr. Fuller's opinion. The ALJ did not substitute Dr. England's testimony for Dr. Fuller's opinion but rather used Dr. England's testimony to reconcile the conflicts between Dr. Fuller's opinion and other examining physicians' opinions. As a result, the ALJ determined Dr. Fuller's opinions conflict with not only his own treatment notes but the opinions of other treating and examining physicians, Ronnfeldt's testimony, Ronnfeldt's daily activities, and the record as a whole. The following are examples of the inconsistencies between Dr. Fuller's records, his own notes, and those of other treating physicians: a diagnosis Ronnfeldt suffered from

bipolar disorder and depression although Ronnfeldt was consistently described from 2004 through 2010 as "euthymic" and in "no acute distress" (AR. 361, 568, 612-613, 616, 618, 870, 875, 909-910, 1027); Dr. Gupta's notation from 2006 through 2008 that Ronnfeldt was doing "okay" and "overall, very well" (AR. 375, 378, 897-898); Dr. Fuller's notation in 2008 that Ronnfeldt "has had no episodes of major ups in his mood or major downs in his mood" and Ronnfeldt has had major improvement in his ability to function and fishes (AR. 569, 572); Dr. Brenner's progress reports from 2008 through 2010 showed Ronnfeldt felt "back to normal," he continued to improve, and he was doing well (AR. 875, 885, 888, 957); Dr. Fuller's notation in 2009 that Ronnfeldt was having no problems with mania, depression, or side affects after Ronnfeldt stated "overall life is going well" (AR. 606); Ronnfeldt's own statement on a questionnaire in 2009 that his problems did not make it difficult at all to work, take care of things, and get along with others (AR. 888); and Dr. Fuller's own treatment notes in 2009 and 2010 indicating Ronnfeldt's mood was "euthymic" and "very oriented" (AR. 568, 909-910, 1027). Dr. England testified "euthymic" is consistent with a "normal range of emotional fluctuation" and conflicts with the moods typically felt by one suffering severe depression (AR. 69). Additionally, throughout the record, Dr. Fuller's treatment notes and other evidence indicated medication regulated Ronnfeldt's behavior and his limitations were not as severe as Dr. Fuller opined (AR. 569, 570, 572, 875). See *Wildman v. Astrue*, 596 F.3d 959, 965 (8th Cir. 2010) ("If an impairment can be controlled by treatment or medication, it cannot be considered disabling."). Thus, Dr. Fuller's opinions of Ronnfeldt's limitations are inconsistent with his own treatment notes and other physicians' opinions.

Further, Ronnfeldt's work history discredited Dr. Fuller's opinions of Ronnfeldt's limitations. Although Ronnfeldt was not diagnosed with an adjustment disorder with mixed anxiety and depression until 2008, Ronnfeldt argues his social phobia can be traced back to his early adolescence and cites examples of social avoidance. See Filing No. 25 - Reply p. 1. However, during the same period Ronnfeldt asserts he suffered from social phobia, which prevented him from making friends, attending weddings, going to the mall, and partaking in other social activities, Ronnfeldt maintained steady employment. Thus, the ALJ properly concluded Ronnfeldt could work with this impairment as he has been able to in the

past.  **See** *Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir. 2000) (reasoning a claimant's history of working with alleged mental impairments was evidence such impairments were not severe).

The ALJ properly determined Dr. Fuller's treatment notes, Ronnfeldt's testimony, other physician's opinions, and the record as a whole did not support Dr. Fuller's opinions. Dr. England's testimony alone did not lead the ALJ to discount Dr. Fuller's opinion, but the record considered in its entirety led the ALJ to discount Dr. Fuller's opinions.  Therefore, substantial evidence in the record as a whole supports the ALJ's decision discount Dr. Fuller's opinions.


**B.**     **Hand Packager**

Ronnfeldt asserts the ALJ erred in relying on VE testimony Ronnfeldt could work as a hand packager, listed in the Dictionary of Occupational Titles (DOT) as "medium work," after the ALJ already limited Ronnfeldt to "light work."  **See**  Filing No. 18 - Brief  p. 21. Ronnfeldt contends the conflict between the DOT's definition of hand packager as "medium work" and the ALJ's finding Ronnfeldt could only perform "light work" results in a violation of the regulations.  *Id.*  Ronnfeldt argues this matter must be remanded for clarification of this discrepancy.  *Id.* at 22.

The DOT controls when a vocational expert's testimony conflicts with the DOT and the DOT's classifications are not rebutted.  *Jones v. Astrue*, 619 F.3d 963, 978 (8th Cir. 2010).  The DOT definitions "are simply generic job descriptions that offer the approximate maximum requirements for each position, rather than their range."  *Id.* (**quoting** *Wheeler v. Apfel*, 224 F.3d 891, 897 (8th Cir. 2000)).

> The DOT itself cautions that its descriptions may not coincide in every respect with the content of jobs as performed in particular establishments or at certain localities.  In other words not all the jobs in every category have requirements identical to or as rigorous as those listed in the DOT.

*Wheeler*, 224 F.3d at 897.  The DOT is not a definitive authority on job requirements. *Moore v. Astrue*, 623 F.3d 599, 604 (8th Cir. 2010).

This court finds the ALJ did not err in relying on the VE's testimony that Ronnfeldt could work as a hand packager after the ALJ limited Ronnfeldt to "light work." In the VE's testimony, the VE limited work as a hand packager to the "light exertional level" and provided an estimate of hand packager jobs available at the "light exertional level." Additionally, the DOT allows for variation within classifications as the descriptions listed are approximations and not exact requirements. Therefore, the ALJ did not err in concluding Ronnfeldt is not disabled because the VE testified Ronnfeldt could work as a hand packager and it is possible to find light work as a hand packager suitable to his limitations. In the alternative, assuming Ronnfeldt could not work as a hand packager, there are a significant number of jobs available to Ronnfeldt as a production assembler. **See** *Jenkins v. Bowen*, 861 F.2d 1083, 1087 (8th Cir. 1988) (noting "500 jobs . . . represents a significant number").

**C.    Production Assembler**

Ronnfeldt argues the ALJ failed to form a hypothetical question based on all of Ronnfeldt's credible limitations. **See** Filing No. 18 - Brief p. 22. Ronnfeldt contends the ALJ erroneously omitted Dr. Von Essen's assessment of Ronnfeldt's postural limitations from the hypothetical question. *Id.* at 24. Dr. Von Essen testified Ronnfeldt "could stand in one spot for six hours but only climb stairs and ladders, stoop, crouch, kneel, and crawl for about fifteen minutes a day" (AR. 897). Ronnfeldt argues if the ALJ gave Dr. Von Essen's opinion "substantial weight" and determined Dr. Von Essen's opinions "are consistent with the record as a whole," then the limitations should have been included in the ALJ's hypothetical question. *Id.* at 23-24. Additionally, Ronnfeldt argues the ALJ's finding Ronnfeldt could work as a production assembler is erroneous because it requires stooping and crouching up to one third of the time. *Id.* Lastly, Ronnfeldt argues the ALJ failed to specify a reason for omitting Dr. Von Essen's assessment of Ronnfeldt's postural limitations in the hypothetical question posed to the VE. *Id.* at 24.

An ALJ's hypothetical question to the VE constitutes substantial evidence when it includes all the claimant's credible impairments. *Hulsey v. Astrue*, 622 F.3d 917, 922 (8th Cir. 2010). The ALJ may rely on vocational expert testimony as "substantial evidence only when the testimony is based on a correctly phrased hypothetical question that captures the

concrete consequences of a claimant's deficiencies." *Robson v. Astrue*, 526 F.3d 389, 392 (8th Cir. 2010). The ALJ may omit alleged impairments from the hypothetical question when the record does not support the claimant's contention that the impairment is a significant restriction on performing gainful employment. *Buckner v. Astrue*, 646 F.3d 549, 561 (8th Cir. 2011). The ALJ is required to fully develop the record but is not required to provide an "in-depth analysis on each piece of evidence." *Renstrom v. Astrue*, 680 F.3d 1057, 1065 (8th Cir. 2012). Though it may be preferable for an ALJ to go into more depth about the opinion of a physician, it is not necessary where substantial evidence supports the ALJ's decision based on the consistent determination of the majority of medical sources. *Id.*

The VE's opinion that Ronnfeldt could perform light work constitutes substantial evidence that Ronnfeldt is not disabled. The ALJ used Ronnfeldt's RFC to formulate a hypothetical question to the VE. In order to have a valid RFC, there must be substantial evidence on the record as a whole to support the ALJ's RFC determination. *Davidson v. Astrue*, 578 F.3d 838, 846 (8th Cir. 2009). Substantial evidence is relevant evidence a reasonable mind would accept as adequate to support a decision. *Id.* RFC is the most the claimant can still do despite physical and mental limitations based on the evidence in the record. 20 C.F.R. § 404.1545(a)(1). In addition to the relevant medical evidence, the ALJ bases the RFC assessment on the relevant non-medical evidence including the claimant's statements. **See** 20 C.F.R. § 404.1545(a)(3). When there are inconsistencies in the claimant's testimony, the ALJ may properly discount part of the testimony. *Id.* Additionally, the ALJ may discount conclusions from a medical expert or treating physician if the conclusions are inconsistent with the record as a whole. *Teague v. Astrue*, 638 F.3d 611, 615-616 (8th Cir. 2011).

The ALJ evaluated medical and non-medical evidence to determine Ronnfeldt's RFC. Dr. Von Essen opined Ronnfeldt was capable of light work including standing for six hours in an eight-hour work day and walking for six hours in an eight-hour work day (AR. 894). Dr. Von Essen determined Ronnfeldt could perform postural activities for only a quarter of an hour. (AR. 894). Dr. Hohensee evaluated Ronnfeldt's limitations based on his medical records in conjunction with Ronnfeldt's primary diagnosis of chronic asthma with a

secondary diagnosis of stable sleep apnea (AR. 418).  Dr. Hohensee concluded Ronnfeldt could lift ten pounds frequently and up to twenty pounds occasionally, could stand and walk for about six hours in an eight-hour workday, and had unlimited ability to push or pull (AR. 419).  With regard to postural limitations, Dr. Hohensee found Ronnfeldt could occasionally climb but could frequently balance, stoop, kneel, crouch, and crawl (AR. 420).   Dr. Hohensee found Ronnfeldt was partially credible and the medical evidence did not support a finding of disability (AR. 423).  Dr. Reed affirmed Dr. Hohensee's assessment (AR. 460).  Dr. Gupta, a treating physician, also agreed with Dr. Hohensee's assessment that Ronnfeldt could perform light work (AR. 867).  The ALJ gave great weight to Dr. Hohensee's opinion because it "is [an] acceptable medical source[ and is] consistent with the record as a whole" (AR. 21).  The ALJ could properly rely on Dr. Hohensee's opinion to determine Ronnfeldt's RFC.

The ALJ also evaluated non-medical evidence to determine Ronnfeldt's RFC.  The ALJ determined "the record does not indicate the quality of [Ronnfeldt's] daily functioning has been severely affected, rather he has been able to independently sustain activities and interests over time" (AR. 25).  The ALJ specifically noted Ronnfeldt's activities which involve frequent stooping and crouching, including:  maintaining the garden (AR. 287); mowing the lawn (AR. 287); doing chores (AR. 287); maintaining his pickup truck (AR. 287); and fishing (AR. 569).  The ALJ determined there was "insufficient evidence of functional limitations that would preclude [Ronnfeldt] from being able to work based on the objective findings, adequate relief with treatment, and [Ronnfeldt's] daily activities" (AR. 25).  The ALJ could properly discount Dr. Von Essen's opinions of Ronnfeldt's postural limitations based on the evidence presented in the record.

In determining Ronnfeldt's RFC, the ALJ considered medical opinions, Ronnfeldt's testimony, and Ronnfeldt's daily living activities.  The ALJ found Ronnfeldt's RFC did not include postural limitations as Dr. Von Essen opined.  The ALJ did not err in omitting the postural limitations Dr. Von Essen prescribed because those limitations conflicted with other physicians' assessments and Ronnfeldt's own testimony of his daily living activities.  Though Ronnfeldt argues the ALJ must state the reason for omitting Dr. Von Essen's assessment; the ALJ need not provide an in depth analysis on every point of evidence when the

substantial evidence clearly supports the ALJ's determination.  The hypothetical posed to the VE included the impairments supported by the record as a whole and captured the concrete consequences of Ronnfeldt's limitations.  The hypothetical question accurately reflected Ronnfeldt's RFC and the VE testified the hypothetical individual, with Ronnfeldt's RFC, could perform work as a production assembler at the light exertional level.  Based on the court's conclusion that substantial evidence supported the ALJ's findings of Ronnfeldt's RFC, this court finds the hypothetical question posed to the VE was proper and the VE's answer constituted substantial evidence, which supports the ALJ's decision Ronnfeldt was not disabled under the Act.

### D.    Development of Medical Evidence

Ronnfeldt asserts the ALJ failed to fully and fairly develop the record because the ALJ relied on the testimony of non-examining and non-treating physicians and rejected Dr. Fuller's opinion.  **See** Filing No. 18 - Brief p. 26.  Ronnfeldt contends the ALJ should have obtained a comprehensive consultative evaluation and included a review of the claimant's records, a personal evaluation, and a statement of the claimant's work-related limitations in order to fairly and fully develop the record.  **Id.**

The ALJ has "a responsibility to develop the record fairly and fully."  **Vossen v. Astrue**, 612 F.3d 1011, 1015 (8th Cir. 2010).  The duty "may include obtaining clarification from treating physicians if a crucial issue is underdeveloped or undeveloped."  **Smith v. Barnhart**, 435 F.3d 926, 930 (8th Cir 2006).  The ALJ's duty to fairly and fully develop the record is not satisfied if the ALJ relied on non-treating, non-examining physicians and there is no medical evidence about how the claimant's impairments affect his ability to work.  **Nevland v. Apfel**, 204 F.3d 853, 858 (8th Cir. 2000).  However, an ALJ does not err by considering a state agency medical consultant's opinion along with the medical evidence as a whole.  **Casey v. Astrue**, 503 F.3d 687, 694 (8th Cir. 2007); **Hacker v. Barnhart**, 459 F.3d 934, 939 (8th Cir. 2006) (having determined the treating physician's opinions were inconsistent with the record the ALJ properly relied on non-treating, non-examining physician medical sources).  The ALJ's duty to fairly and fully develop the record is not

"never-ending," when there is ample evidence to determine whether a claimant is disabled. *McCoy v. Asture*, 648 F.3d 605, 612 (8th Cir. 2011).

The ALJ fairly and fully developed the record and did not solely rely on a non-examining, non-treating physician's opinion to determine Ronnfeldt is not disabled as defined by the SSA. Ronnfeldt relies heavily on the facts in *Nevland*, where the Eighth Circuit decided the record was not fairly and fully developed when the ALJ's decision expressed none of the treating physicians' or examining physicians' opinions on the claimant's ability to work in the present. See *Nevland v. Apfel*, 204 F.3d 853 (8th Cir. 2000). However, in the case at bar, the ALJ gave substantial weight to treating physician Dr. Gupta's opinion. The ALJ also relied on Drs. Fuortes', Hohensee's, and Olwan's evaluations. Most importantly, the ALJ relied upon Dr. Fuller's treatment notes. The ALJ assessed multiple opinions and notes from examining and treating physicians, opinions from non-treating and non-examining physicians, and Ronnfeldt's own testimony to determine Ronnfeldt's impairments. The ALJ obtained and considered a significant amount of evidence. In fact, Ronnfeldt's attorney even stated "we have more than enough to decide" when asked whether the file was complete (AR. 40). Therefore, the court finds the ALJ fairly and fully developed the record and considered evidence from treating and non-treating, non-examining physicians to determine Ronnfeldt's limitations.

## E.    Ronnfeldt's Literacy

Ronnfeldt argues the ALJ erred by failing to test Ronnfeldt's literacy. See Filing No. 18 - Brief p. 28. Ronnfeldt contends he suffers from BIF and received low scores in grade school for reading and writing, which attest to his illiteracy and counter the use of a numerical grade level to determine his educational abilities. *Id.* Ronnfeldt argues the ALJ's decision should be remanded for clarification of Ronnfeldt's literacy. *Id.*

"Illiteracy means the inability to read or write." 20 C.F.R. § 404.1564(b)(1). Someone who "cannot read or write a simple message such as instructions or inventory lists" is illiterate. *Id.* A claimant has been found to be literate with as little as a fifth grade education, the ability to follow diagrams and measurements quite well, and the ability to read and write the simplest letter. *Starks v. Bowen*, 873 F.2d 187, 189 (8th Cir. 1989). A

finding of literacy is warranted even when the claimant can only write or read simple messages. *Id.*

The ALJ did not err by failing to further develop the record as to Ronnfeldt's literacy. In a Daily Activities and Symptom report, apparently completed and signed by Ronnfeldt, he reported he looks at and reads newspapers and magazines (AR. 287-291). Ronnfeldt also informed Dr. Olwan that Ronnfeldt reads newspapers (AR. 431). Ronnfeldt completed a ninth grade education (AR. 42). The record clearly indicates Ronnfeldt can read at a level sufficient to pass the literacy requirements set forth in the regulations. Therefore, the ALJ did not err by failing to further develop the record as to Ronnfeldt's literacy.

## CONCLUSION

Accordingly, the court holds substantial evidence on the record as a whole supports the ALJ's decision. The court therefore concludes the ALJ's decision, which represents the final decision of the Commissioner of the SSA, should not be reversed or remanded and affirms the Commissioner's decision.

**IT IS ORDERED:**

The Commissioner's decision is affirmed, the appeal is denied, and judgment in favor of the defendant will be entered in a separate document.

DATED this 6th day of August, 2012.

BY THE COURT:

s/Thomas D. Thalken
United States Magistrate Judge